1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT
9                  FOR THE EASTERN DISTRICT OF CALIFORNIA
10
11   NAPOLEON PEREA, II,                    No. CIV S-10-2237-CMK
12                Plaintiff,
13          vs.                             MEMORANDUM OPINION AND ORDER
14   COMMISSIONER OF SOCIAL
     SECURITY,
15                Defendant.
16   _____/
17

18          Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21   judge for all purposes, including entry of final judgment.  See 28 U.S.C. § 636(c).  Pending

22   before the court are plaintiff's motion for summary judgment (Doc. 21) and defendant's cross-

23   motion for summary judgment (Doc. 22).

24   / / /

25   / / /

26   / / /

                                              1

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on October 4, 2007.  In the application, plaintiff claims that disability began on January 1, 2007.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on April 15, 2009, before Administrative Law Judge ("ALJ") Sandra K. Rogers.   In a September 24, 2009, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

> 1. The claimant has the following severe impairments: status post gunshot wound to left shoulder and jaw, status post methamphetamine abuse, and borderline intellectual functioning;
>
> 2. The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;
>
> 3. The claimant has the residual functional capacity to perform medium work except for any climbing of ladders, ropes, or scaffolds, and more than occasional overhead reaching with his left upper extremity, and more than simple, repetitive tasks consistent with two-step directives necessary for unskilled work in a non-public work setting; and
>
> 4. Considering the claimant's age, education, work experience, residual functional capacity, and vocational expert testimony, there are jobs that exist in significant numbers in the national economy that the claimant can perform [list of sample jobs omitted].

After the Appeals Council declined review on June 25, 2010, this appeal followed.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following relevant evidence, summarized chronologically below:[1]

October 17, 2007 – Plaintiff's mother, Rosemary Perea, submitted a Function Report – Adult – Third Party.  Ms. Perea reported that plaintiff does not care for any children, pets, or other adults.  She stated that his condition affects his sleep because he "becomes stiff." Ms. Perea stated that plaintiff has no difficulty with personal care.  She said he does ironing and mowing, and that he gets around "daily" by walking and using public transit.  For hobbies and interests, Ms. Perea indicated "sport" and said he does these things "daily."  She did not know whether plaintiff experienced any changes in these activities since the onset of his condition.

October 18, 2007 – Plaintiff submitted a Function Report – Adult.  Plaintiff stated that, on a typical day, he will eat breakfast, wash himself, go to the park, sometimes play handball, eat lunch at the Mission Dining Hall, go home, watch television, then go to bed.  He stated that he cares for children by taking them to the park.  He stated that his impairments affect his ability to sleep due to "stiffness in left arm."  He stated he has no problems with personal care.  He reported no change in cooking habits since his condition began.  As to chores, plaintiff stated that he cleans, does laundry, and irons.  He stated that he sometimes needs encouragement to do these tasks.  He stated that when he goes out he walks or takes public transit.  When asked how long he can walk without needing to rest, how long he can pay attention, whether he'd ever been fired from a job because of problems getting along with others, how well he handles stress, whether he's noticed any unusual behavior, or how well he handles changes in routine, plaintiff responded "Don't know."  He stated that he follows written and spoken instructions "ok."

/ / /

/ / /

---

[1]    As plaintiff observes, the record contains no records from treating providers.

December 3, 2007 – Agency doctor Jenna Brimmer, M.D., performed an internal medicine examination.  Dr. Brimmer described the following history:

> The claimant says he has problems with his arm.  He sustained a gunshot wound in 1992.  It entered the back of his shoulder and exited the front.  It injured his nerves and bones and he did undergo surgery.  He had the nerves repaired and a bone graft from his hip to his arm, as well as hardware placed.  He continues to have weakness in his left upper extremity and says it feels "awkward."  When he does activities such as twisting with his arm or raising his arm above his shoulder, it causes stiffness.  He did undergo postoperative physical therapy which improved range of motion and strength.

The doctor added:

> The claimant lives alone.  He last worked in 1992 doing temporary labor work.  He is not sure why he stopped working.  At home the claimant can dress himself, perform his own hygiene.  He is able to cook and wash his dishes.  He can mop and vacuum the floor.  He does not do his laundry.  He says his mother does this.  He has never done his laundry.  He plays handball as his only hobby.

Dr. Brimmer also noted that plaintiff has a history of PCP and methamphetamine abuse until about one year prior to the examination.  Based on result of a physical examination, Dr. Brimmer offered the following functional assessment:

> The number of hours the claimant could be expected to stand, walk, and sit in an eight-hour workday would be without limitations.
>
> No assistive devices are required.
>
> The amount of weight the claimant could be expected to lift and carry would be an occasional 50 pounds and frequent 25 pounds.  Limited by the claimant's mild left upper extremity weakness.

December 4, 2007 – Agency psychologist James Wakefield, Jr., Ph.D., performed a psychological assessment.  Dr. Wakefield noted that plaintiff had never received psychiatric intervention.  As to current daily activities, Dr. Wakefield reported:

> Napoleon stated that he is currently living by himself in a studio apartment.  He stated that he received general relief and they require that he work.  He indicated that he works 7 days per month raking leaves and doing clean-up work at parks.  Napoleon stated that he will occasionally visit his parents, and when he travels he will typically go on the bus.  He

also stated that when there is a family function he will typically attend. Daily activities typically involve going to the park across the street and playing handball.  Napoleon stated that he prepares his own meals.

Following psychological testing, Dr. Wakefield provided the following summary:

> 1.      Napoleon achieved a Full-Scale IQ score of 79 on the Wechsler Adult Intelligence Scale III.  This score fell more than one standard deviation below the mean, and placed his measured level of intellectual skills within the borderline range.
>
> 2.      Napoleon's performance on the Bender Visual-Motor Gestalt Test II indicated that his ability to formulate visual-motor movements was in the borderline range for his chronological age group.
>
> 3.      Napoleon had no difficulty completing Part A of the Trail Making Test, but was not able to successfully complete the more complicated Part B.
>
> 4.      Napoleon achieved a General Memory Index of 68 on the Wechsler Memory Scale III.  This score fell more than 2 standard deviations below the mean, and indicated the presence of significant impairment in his measured ability to utilize memory.

Dr. Wakefield diagnosed learning disorder and borderline intellectual functioning.  He assigned a Global Assessment of Functioning ("GAF") score of 75 on a 100-point scale.  The doctor offered the following conclusions:

> This 46 year of age male appears to have an extensive history of criminal behavior.  He was incarcerated in CYA as an adolescent, and has spent a large portion of his adult life in the state prison system.  He reports having no history of drug abuse issues or treatment for mental health issues. Results from current standardized tests indicated that he is functioning within the borderline range for his chronological age group.  His profile from standardized tests additionally indicated the presence of a specific learning disorder associated with deficits in short-term memory sensory processing.  Napoleon was able to successfully perform a task involving a simple one-step directive with visuo-spatial search, but was not able to successfully perform a more complicated task involving a two-step directive.  He appeared to possess adequate social skills for typical kinds of simple interpersonal situations.  He would not appear capable of handling benefit payments in his best interests.

/ / /

/ / /

/ / /

5

December 27, 2007 – Agency reviewing doctor D.R. Conte, M.D., completed a psychological residual functional capacity assessment.  The doctor noted several moderate limitations, but no marked limitations in any category of functioning.  Dr. Conte opined that plaintiff could perform unskilled non-detailed tasks in a non-public setting.

January 3, 2008 – Agency reviewing doctor Luis R. DeSouza, M.D., submitted a physical residual functional capacity assessment.  The doctor opined that plaintiff could occasionally lift up to 50 pounds and frequently lift up to 25 pounds.  Plaintiff could stand/walk/sit for about 6 hours in an 8-hour workday.  Plaintiff's ability to push/pull was considered to be unlimited.  Dr. DeSouza checked the box for "limited" for reaching in all directions, including overhead.  For objective findings to support these opinions, Dr. DeSouza cited a decreased range of motion of the left shoulder with forward elevation, and mild muscle weakness in the left deltoid with mild shoulder drop on passive testing.  Specifically as to the doctor's limitation on reaching, Dr. DeSouza explained that finding by noting: "OH reach occasional LUE."  In other words, Dr. DeSouza limited plaintiff to only occasional overhead reaching with the left upper extremity.  No postural limitations were noted except that plaintiff should never climb ladders, ropes, or scaffolds.   No visual, communicative, or environmental limitations were noted.

March 14, 2009 – Agency psychologist Les Kalman, Psy.D., reported on a psychiatric evaluation.  Plaintiff reported that he last worked in 1990 doing warehouse work.  He said he stopped working because he was shot in the arm.  Plaintiff also told Dr. Kalman that he had used methamphetamine but that he stopped four years earlier.  Following a mental status examination, Dr. Kalman diagnosed cognitive disorder secondary to head trauma and assigned a GAF score of 52.  Dr. Kalman did not offer any assessment of plaintiff's residual mental functional capacity.

/ / /

/ / /

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

### IV.  DISCUSSION

In his motion for summary judgment, plaintiff argues: (1) the ALJ improperly evaluated the opinions of the examining and consultative doctors; (2) the ALJ failed to make any finding as to plaintiff's testimony; (3) the ALJ failed to consider lay witness evidence; (4) the ALJ relied on vocational expert testimony which was not based on an accurate description of plaintiff's limitations; and (5) the vocational expert failed to state whether his opinions were consistent with the Dictionary of Occupational Titles ("DOT").

1    **A.    Evaluation of Medical Opinions**

2            The weight given to medical opinions depends in part on whether they are

3    proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

4    821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

5    professional, who has a greater opportunity to know and observe the patient as an individual,

6    than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

7    (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

8    to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

9    (9th Cir. 1990).

10           In addition to considering its source, to evaluate whether the Commissioner

11   properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

12   in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

13   uncontradicted opinion of a treating or examining medical professional only for "clear and

14   convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

15   While a treating professional's opinion generally is accorded superior weight, if it is contradicted

16   by an examining professional's opinion which is supported by different independent clinical

17   findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

18   1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

19   rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

20   81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

21   the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

22   finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

23   legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

24   professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

25   without other evidence, is insufficient to reject the opinion of a treating or examining

26   professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

see also Magallanes, 881 F.2d at 751.

    1.   Examining Doctors

    Plaintiff argues that the ALJ erred by accepting the opinion of Dr. Brimmer but

rejecting the opinions of Drs. Kalman and Wakefield without providing clear and convincing

reasons for doing so.  Plaintiff adds:

> Clear and convincing reasons are needed to reject the opinions of Drs. Wakefield and Kalman, because they are the only two examining mental health doctors, and they are in accord with each other and the opinion of the Agency reviewing psychiatrist, Dr. Conte.  The opinion of Dr. Brimmer, who is not a psychologist or psychiatrist, does not serve to contradict the opinions of these three doctors.  Here, the ALJ failed to supply clear and convincing reasons, or even specific and legitimate reasons, to reject these opinions.

As to Drs. Wakefield and Kalman, the ALJ stated:

> In December 2007, the claimant was evaluated in a consultative examination by James Wakefield, Ph.D., to determine his cognitive, perceptual-motor, academic, and mental health status (Exhibit 2F).  During the course of the evaluation, the claimant reported sustaining three separate head injuries, including surgery and insertion of a plate and gunshot wounds on two different occasions.  He also acknowledged an extensive criminal history.  However, he denied any prior psychiatric treatment and denied taking any prescription medications, including any psychotropic medications.  The claimant reported that he was receiving general relief which requires that he work seven days per week, raking leaves and doing clean-up work at parks.

> As noted by Dr. Wakefield, the claimant was alert and fully oriented but gave a mixed performance in terms of his memory testing (Exhibit 2F, p. 2).  Based on extensive testing, Dr. Wakefield diagnosed the claimant with a learning disorder and borderline intellectual functioning but gave him a Global Assessment of Functioning of 75, which is clearly inconsistent with a finding that the claimant has a disabling mental impairment or impairments.

> The undersigned rejects Dr. Wakefield's opinion that the claimant is unable to perform two-step directives.  As a consulting physician, his opinion is not entitled to controlling weight or great deference.  Pursuant to Social Security Ruling 06-3p, the undersigned notes that the claimant's activities of daily living, including the general relief work activities,

demonstrate his ability to perform two-step directives.  Moreover, the claimant lives alone, is able to perform adequate self-care, moves through the community, manages his own funds, attends church, and takes public transportation.  Clearly, these are not the activities of an individual as severely limited as determined by Dr. Wakefield.

The undersigned also rejects the opinion of Dr. Les P. Kalman, an examining psychiatrist (Exhibit 10F).  Dr. Kalman has reported work-related limitations which, if credible, would clearly render the claimant disabled.  Pursuant to Social Security Rulings 06-3p and 96-2p, the undersigned rejects Dr. Kalman's opinion for the same reasons identified for rejecting Dr. Wakefield's opinion.  Moreover, the undersigned notes that Dr. Kalman has a history of reporting very restrictive assessments of claimants mental residual functional capacities.

At the outset, the court notes that, contrary to plaintiff's apparent argument, it is obvious that the ALJ did not reject the opinions of Drs. Kalman or Wakefield, either in whole or in part, based on a finding that these doctors' opinions were contradicted by those of Dr. Brimmer.

The court first addresses plaintiff's contention that the opinions of Drs. Wakefield and Kalman are not contradicted, finding that they in fact are.  Dr. Conte opined that plaintiff could perform unskilled non-detailed tasks in a non-public setting.  This opinion contradicts Dr. Wakefield's opinion that plaintiff could not perform two-step work directives because, as plaintiff notes, even unskilled work involves more than one step.  Dr. Conte's opinion that plaintiff could perform unskilled work also contradicts Dr. Kalman's conclusion that plaintiff's GAF is 52, which would be disabling.  In short, Drs. Kalman and Wakefield ultimately concluded that plaintiff could not perform any work tasks, whereas Dr. Conte concluded that he could.  Given this contradiction, the court finds that the ALJ need only provide specific and legitimate reasons to reject the opinions of Drs. Wakefield and Kalman.

Turning to Dr. Wakefield, as the ALJ noted, plaintiff reported a wide range of daily activities, including cooking, ironing, shopping, playing handball, and working in the park doing clean-up chores.  These activities are inconsistent with Dr. Wakefield's opinion that plaintiff cannot perform tasks involving two-step directives.  For example, performing clean-up tasks in the park would require at least a two-step directive – step one: pick up trash; step two:

1    put trash in proper bin.  Playing handball similarly requires performing more than one step.  The

2    inconsistency noted by the ALJ constituted a specific and legitimate reason to reject Dr.

3    Wakefield's opinion that plaintiff cannot perform two-step directives.

4            Plaintiff cites no authority in support is his argument that these activities do not

5    relate to plaintiff's ability to perform work-related tasks because they are activities plaintiff

6    already knows how to do.  At some point after plaintiff stopped working, according to him due to

7    his impairments, he started working in the park in order to qualify for general assistance.

8    Therefore, even though plaintiff was allegedly disabled, he nonetheless learned the new activity

9    of cleaning up the park.  Thus, despite plaintiff's alleged disability he was able to learn this new,

10   multi-step job.   This was not a job that plaintiff performed before the onset of disability.

11           As to Dr. Kalman, plaintiff argues that by stating that this doctor's opinion is

12   rejected for the same reasons cited for rejecting Dr. Wakefield's opinion, the ALJ failed to

13   provide reasons "specific or germane to Dr. Kalman."  Plaintiff adds: "[I]t seems improbable that

14   exactly the same reasons would apply to two different doctors."  First, plaintiff cites no authority

15   in support of his position that the ALJ may not rely on the same reasons to reject multiple

16   doctors' opinions.  In fact, contrary authority exists.  See Morgan v. Apfel, 169 F.3d 595, 602

17   (9th Cir. 1999); Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989); see e.g. Valentine v.

18   Commissioner Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) (approving rejection of a

19   third-party family member's testimony, which was similar to the claimant's, for the same reasons

20   given for rejection of the claimant's complaints).  As with Dr. Wakefield, Dr. Kalman's

21   assessment that plaintiff's GAF score is 52, which would indicate the presence of disabling

22   impairments, is inconsistent with plaintiff's daily activities and provides a specific and legitimate

23   reason for rejecting the doctor's opinion that plaintiff is disabled due to mental impairments.

24   / / /

25   / / /

26   / / /

1          2.      Consultative Doctors

2          Plaintiff argues that the ALJ improperly ignored the opinion of Dr. Conte, a

3 consultative doctor who reviewed records but did not perform an examination.  Specifically, he

4 claims that the many moderate limitations noted by Dr. Conte render him disabled.  Plaintiff

5 concludes from this that Dr. Conte's opinion was that he is disabled and that, in finding that

6 plaintiff is not disabled, the ALJ must have rejected Dr. Conte's opinions.  This might be true if

7 Dr. Conte in fact concluded that plaintiff was disabled.  Dr. Conte did not.  Though the doctor

8 noted several moderate limitations, the doctor ultimately concluded that plaintiff could perform

9 unskilled non-detailed (i.e., simple) tasks in a non-public setting.  As defendant correctly

10 observes, Dr. Conte's ultimate conclusion that plaintiff can perform simple tasks adequately

11 takes into account moderate mental limitations.  See Stubbs-Danielson v. Astrue, 539 F.3d 1169,

12 1173-74 (9th Cir. 2008).  In other words, the effect of Dr. Conte's noted moderate limitations is

13 informed by the doctor's ultimate conclusion that, despite such limitations, plaintiff can still

14 perform simple tasks.

15          Plaintiff also appears to argue that the ALJ improperly rejected opinions provided

16 by Dr. DeSouza, who reviewed records.  Specifically, he claims that the ALJ failed to include in

17 her hypothetical posed to the vocational expert Dr. DeSouza's opinion that plaintiff is limited in

18 overhead reaching in all directions.  Plaintiff misreads Dr. DeSouza's opinion.  When asked to

19 explain how plaintiff is limited in reaching, Dr. DeSouza indicated: "OH reach occasional LUE."

20 Thus, the doctor limited plaintiff to only occasional overhead reaching with his left upper

21 extremity, not reaching in all directions.

22    **B.    Plaintiff's Testimony**

23          Plaintiff argues that the ALJ erred by making no findings with respect to his

24 credibility, in violation of Social Security Ruling 96-7p.  While the ALJ never specifically

25 declared that she thought plaintiff's statements were not credible, it is obvious from the hearing

26 decision that she thought so.  For example, the ALJ stated: "[T]he claimant's failure to work in

the past is more than likely due to substance abuse rather than his inability to work." This is a complete rejection of plaintiff's testimony that he is disabled due to his impairments, in particular his mental and cognitive limitations. Similarly, the ALJ concluded that plaintiff's activities of daily living undermine his claim that he is disabled, again tacitly rejecting plaintiff's testimony to the contrary.

Even assuming the ALJ did err by not explicitly using the word "credibility" when discussing plaintiff's claim that he is totally disabled, any such error is harmless. The Ninth Circuit has applied harmless error analysis in social security cases in a number of contexts. For example, in Stout v. Commissioner of Social Security, 454 F.3d 1050 (9th Cir. 2006), the court stated that the ALJ's failure to consider uncontradicted lay witness testimony could only be considered harmless ". . . if no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Id. at 1056; see also Robbins v. Social Security Administration, 466 F.3d 880, 885 (9th Cir. 2006) (citing Stout, 454 F.3d at 1056). Similarly, in Batson v. Commissioner of Social Security, 359 F.3d 1190 (9th Cir. 2004), the court applied harmless error analysis to the ALJ's failure to properly credit the claimant's testimony. Specifically, the court held:

> However, in light of all the other reasons given by the ALJ for Batson's lack of credibility and his residual functional capacity, and in light of the objective medical evidence on which the ALJ relied there was substantial evidence supporting the ALJ's decision. Any error the ALJ may have committed in assuming that Batson was sitting while watching television, to the extent that this bore on an assessment of ability to work, was in our view harmless and does not negate the validity of the ALJ's ultimate conclusion that Batson's testimony was not credible.

> Id. at 1197 (citing Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990)).

In Curry, the Ninth Circuit applied the harmless error rule to the ALJ's error with respect to the claimant's age and education. The Ninth Circuit also considered harmless error in the context of the ALJ's failure to provide legally sufficient reasons supported by the record for rejecting a medical opinion. See Widmark v. Barnhart, 454 F.3d 1063, 1069 n.4 (9th Cir. 2006).

1    The harmless error standard was applied in <u>Carmickle v. Commissioner</u>, 533 F.3d

2 1155 (9th Cir. 2008), to the ALJ's analysis of a claimant's credibility.  Citing <u>Batson</u>, the court

3 stated:  "Because we conclude that . . . the ALJ's reasons supporting his adverse credibility

4 finding are invalid, we must determine whether the ALJ's reliance on such reasons was harmless

5 error."  <u>See id.</u> at 1162.  The court articulated the difference between harmless error standards set

6 forth in <u>Stout</u> and <u>Batson</u> as follows:

7     . . . [T]he relevant inquiry [under the <u>Batson</u> standard] is not
     whether the ALJ would have made a different decision absent any error. . .
8     it is whether the ALJ's decision remains legally valid, despite such error.
     In <u>Batson</u>, we concluded that the ALJ erred in relying on one of several
9     reasons in support of an adverse credibility determination, but that such
     error did not affect the ALJ's decision, and therefore was harmless,
10     because the ALJ's remaining reasons *and ultimate credibility*
     *determination* were adequately supported by substantial evidence in the
11     record.  We never considered what the ALJ would do if directed to
     reassess credibility on remand – we focused on whether the error impacted
12     the *validity* of the ALJ's decision.  Likewise, in <u>Stout</u>, after surveying our
     precedent applying harmless error on social security cases, we concluded
13     that "in each case, the ALJ's error . . . was inconsequential to the *ultimate*
     *nondisability determination*."

14
      Our specific holding in <u>Stout</u> does require the court to consider
15     whether the ALJ would have made a different decision, but significantly,
     in that case the ALJ failed to provide *any reasons* for rejecting the
16     evidence at issue.  There was simply nothing in the record for the court to
     review to determine whether the ALJ's decision was adequately supported.

17
     <u>Carmickle</u>, 533 F.3d at 1162-63 (emphasis in original; citations omitted).
18

19 Thus, where the ALJ's errs in not providing any reasons supporting a particular determination

20 (i.e., by failing to consider lay witness testimony), the <u>Stout</u> standard applies and the error is

21 harmless if no reasonable ALJ could have reached a different conclusion had the error not

22 occurred.  Otherwise, where the ALJ provides analysis but some part of that analysis is flawed

23 (i.e., some but not all of the reasons given for rejecting a claimant's credibility are either legally

24 insufficient or unsupported by the record), the <u>Batson</u> standard applies and any error is harmless

25 if it is inconsequential to the ultimate decision because the ALJ's disability determination

26 nonetheless remains valid.

Accepting plaintiff's argument for the moment that the ALJ failed to address credibility as required by the regulations, the error would be in not providing any reasons for a particular required determination (here, credibility) and the <u>Stout</u> standard would apply.  Thus, if no reasonable ALJ could have found plaintiff credible, then any error is harmless.  The court concludes that such is the case here.  In particular, any reasonable ALJ would have found plaintiff not credible based solely on inconsistencies among his various statements.  For example, he told Dr. Brimmer that he last worked in 1992 doing temporary labor work and did not know why he stopped working.  He also told Dr. Brimmer that he last used methamphetamine about a year prior to the examination in December 2007 (i.e., sometime in 2006).  However, plaintiff reported to Dr. Kalman in March 2009 that he last worked in 1990 and stopped because he was shot in the arm.  He also reported to Dr. Kalman that he last used methamphetamine four years prior to the evaluation (i.e., sometime in 2005).  Plaintiff reported to Dr. Wakefield no history of drug abuse.  These inconsistent statements clearly undermine plaintiff's credibility.

### C.    Lay Witness Evidence

In determining whether a claimant is disabled, an ALJ generally must consider lay witness testimony concerning a claimant's ability to work.  <u>See Dodrill v. Shalala</u>, 12 F.3d 915, 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment."  <u>See Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness."  <u>Dodrill</u>, 12 F.3d at 919.  ALJ may cite same reasons for rejecting plaintiff's statements to reject third-party statements where the statements are similar.  <u>See Valentine v. Commissioner Soc. Sec. Admin.</u>, 574 F.3d 685, 694 (9th Cir. 2009) (approving rejection of a third-party family member's testimony, which was similar to the claimant's, for the same reasons given for rejection of the claimant's complaints).

1        The ALJ, however, need not discuss all evidence presented.  See Vincent on

2  Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain

3  why "significant probative evidence has been rejected." Id. (citing Cotter v. Harris, 642 F.2d 700,

4  706 (3d Cir.1981).  Applying this standard, the court held that the ALJ properly ignored evidence

5  which was neither significant nor probative.  See id. at 1395.  As to a letter from a treating

6  psychiatrist, the court reasoned that, because the ALJ must explain why he rejected

7  uncontroverted medical evidence, the ALJ did not err in ignoring the doctor's letter which was

8  controverted by other medical evidence considered in the decision.  See id.  As to lay witness

9  testimony concerning the plaintiff's mental functioning as a result of a second stroke, the court

10  concluded that the evidence was properly ignored because it "conflicted with the available

11  medical evidence" assessing the plaintiff's mental capacity.  Id.

12        In Stout v. Commissioner, the Ninth Circuit recently considered an ALJ's silent

13  disregard of lay witness testimony.  See 454 F.3d 1050, 1053-54 (9th Cir. 2006).  The lay witness

14  had testified about the plaintiff's "inability to deal with the demands of work" due to alleged

15  back pain and mental impairments.  Id.  The witnesses, who were former co-workers testified

16  about the plaintiff's frustration with simple tasks and uncommon need for supervision.  See id.

17  Noting that the lay witness testimony in question was "consistent with medical evidence," the

18  court in Stout concluded that the "ALJ was required to consider and comment upon the

19  uncontradicted lay testimony, as it concerned how Stout's impairments impact his ability to

20  work." Id. at 1053.   The Commissioner conceded that the ALJ's silent disregard of the lay

21  testimony contravened Ninth Circuit case law and the controlling regulations, and the Ninth

22  Circuit rejected the Commissioner's request that the error be disregarded as harmless.  See id. at

23  1054-55.  The court concluded:

24              Because the ALJ failed to provide any reasons for rejecting competent lay
              testimony, and because we conclude that error was not harmless,
25              substantial evidence does not support the Commissioner's decision . . .

26              Id. at 1056-67.

1          From this case law, the court concludes that the rule for lay witness testimony

2   depends on whether the testimony in question is controverted or consistent with the medical

3   evidence.  If it is controverted, then the ALJ does not err by ignoring it.  See Vincent, 739 F.2d at

4   1395.  If lay witness testimony is consistent with the medical evidence, then the ALJ must

5   consider and comment upon it.  See Stout, 454 F.3d at 1053.  However, the Commissioner's

6   regulations require the ALJ consider lay witness testimony in certain types of cases.  See Smolen

7   v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); SSR 88-13.  That ruling requires the ALJ to

8   consider third-party lay witness evidence where the plaintiff alleges pain or other symptoms that

9   are not shown by the medical evidence.  See id.  Thus, in cases where the plaintiff alleges

10  impairments, such as chronic fatigue or pain (which by their very nature do not always produce

11  clinical medical evidence), it is impossible for the court to conclude that lay witness evidence

12  concerning the plaintiff's abilities is necessarily controverted such that it may be properly

13  ignored.  Therefore, in these types of cases, the ALJ is required by the regulations and case law to

14  consider lay witness evidence.

15         Plaintiff argues that the ALJ erred by ignoring his mother's third-party statement.

16  The court rejects this argument because Ms. Perea's statements are clearly inconsistent with the

17  medical record of evidence.  As such they were not particularly probative and the ALJ did not err

18  by silently disregarding Ms. Perea's statements.  Her statements are also not particularly

19  probative because, for many questions, she responded "Don't know."

20         **D.    Vocational Expert Testimony**

21         The ALJ may meet his burden under step five of the sequential analysis by

22  propounding to a vocational expert hypothetical questions based on medical assumptions,

23  supported by substantial evidence, that reflect all the plaintiff's limitations.  See Roberts v.

24  Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically, where the Medical-Vocational

25  Guidelines are inapplicable because the plaintiff has sufficient non-exertional limitations, the

26  ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

1    1341 (9th Cir. 1988).

2           Hypothetical questions posed to a vocational expert must set out all the

3    substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

4    Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

5    limitations, the expert's testimony as to jobs in the national economy the claimant can perform

6    has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

7    the ALJ may pose to the expert a range of hypothetical questions based on alternate

8    interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

9    determination must be supported by substantial evidence in the record as a whole.  See Embrey v.

10   Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

11          Plaintiff claims error because the ALJ never used the phrase "two-step" in

12   describing plaintiff's limitations to the vocational expert.  In fact, he asserts that the ALJ

13   committed some kind of misconduct by adding "two-step" to her residual functional capacity

14   finding "post-hoc."  According to plaintiff, the distinction between one-step and two-step tasks is

15   critical.  The court does not agree.  The vocational expert testified, however, unskilled work

16   subsumes both one-step and two-step tasks.  In other words, as the expert testified, one must be

17   able to perform at least two steps to be considered capable of unskilled work.

18          **E.     Consistency of Vocational Testimony with DOT**

19          Defendant concedes that the ALJ erred by not inquiring of the vocational expert

20   whether his testimony was consistent with the DOT.  Defendant argues, however, that any error

21   is harmless because plaintiff has failed to demonstrate that a conflict in fact exists.  See Massachi

22   v. Astrue, 486 F.3d 1149 n.19; Chinseki v. Sanders, 129 S.Ct. 1696, 1706 (2009) (holding that

23   the burden of showing that an error is harmful falls upon the party attacking the agency's

24   decision).  In this case, plaintiff has not demonstrated that there is in fact any inconsistency

25   between the vocational expert's testimony and the DOT.  In his reply brief, plaintiff argues that

26   there is necessarily a conflict because the vocational expert testified that plaintiff could perform

18

work as a diswasher but that job is not listed in the DOT.  The court does not agree.  A conflict would exist if the DOT said one thing and the vocational expert said another.  There can be no conflict where the DOT is silent because there is nothing as to which the vocational expert's testimony is in disagreement.  A simple analogy suffices to demonstrate the point:  if one person says the sky is yellow and another person is silent on the matter, the first person's statement is not in conflict with the second person's silence.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff's motion for summary judgment (Doc. 21) is denied;

2.      Defendant's cross-motion for summary judgment (Doc. 22) is granted; and

3.      The Clerk of the Court is directed to enter judgment and close this file.

DATED:  March 29, 2012

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE